**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN LEVIN, on behalf of himself and all others similarly situated,<br><br>                         Plaintiff,<br><br>            v.<br><br>WHITESTONE HOME FURNISHINGS, LLC, d/b/a SAATVA, 1902 Whitestone Expy, Ste 201, Whitestone, NY 11357<br><br>                     Defendant. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

**PREAMBLE**

Plaintiff Brian Levin ("Plaintiff") individually and on behalf of himself and other similarly situated individuals, by and through his counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendant Whitestone Home Furnishings, LLC d/b/a Saatva ("Saatva" or "Defendant") regarding the false and deceptive marketing and sale of its crib mattresses (the "Product").[1] Saatva's advertising of the Product causes consumers to believe that the Product is chemical-free, natural, and eco-friendly.[2] The Product is not chemical-free, natural, and eco-friendly. Instead, it contains per- and polyfluoroalkyl substances ("PFAS"), a group of synthetic chemicals that are extremely resistant to degradation, persist indefinitely in the environment, bioaccumulate in blood and body tissues, and can be harmful to humans and the environment, even at very low levels. This is especially concerning considering that the Product is meant for infants and toddlers, who as explained *infra*, are a vulnerable population when it

---

[1] Plaintiff alleges that any Saatva products that contain per- and polyfluoroalkyl substances and are represented as "chemical-free," "natural," "eco-friendly," or are represented with any environmental sustainability language, are within the scope of this Complaint. Plaintiff reserves the right to add future Products.

[2] *See Crib Mattress*, Saatva, https://www.saatva.com/mattresses/crib-mattress (last visited Oct. 3, 2025).

comes to PFAS exposure. Plaintiff alleges the following based upon personal knowledge, information, belief, and the investigation of Counsel:

## INTRODUCTION

1.    This case concerns deceptive marketing representations made about Saatva's crib mattress.

2.    Defendant Saatva manufactures and sells mattresses, furniture, bedding, and bath products for adults, children, and pets, including infant crib mattresses such as the Product at issue here, both in stores and online, to consumers nationwide.

3.    Through express and implied representations, Saatva markets the Product to consumers as chemical-free, natural, and eco-friendly.

4.    Saatva also uses third-party "certifications" to market itself as a sustainable company and further to assure consumers that the Product is environmentally sound.

5.    Contrary to Saatva's representations, however, testing of the Product reveals the presence of synthetic PFAS chemicals. Specifically, testing has found the following PFAS:

| ANALYTE | Result (ng/g) |
|---|---|
| Perfluorohexanoic acid (PFHxA) | 8.5 |
| Perfluorohexanoic acid (PFHxA) | 10 |
| Perfluorobutanoic acid (PFBA) | 3.0 |
| Perfluorobutanoic acid (PFBA) | 2.4 |
| Perfluoropentanoic acid (PFPeA) | 1.4 |
| Perfluoropentanoic acid (PFPeA) | 1.1 |

6.    Independent testing of the Product cover detected 2052 parts per million (ppm) of total organic fluorine (TOF), a screening method used to indicate the presence of per- and polyfluoroalkyl substances (PFAS). While TOF does not identify specific PFAS compounds, a result exceeding 2,000 ppm strongly suggests the intentional use of PFAS in the Product.

2

7.    PFAS, such as those found in the Product, are not organic or natural, have a negative impact on humans and the environment, and would not be expected in a mattress marketed as chemical-free, natural, and eco-friendly.

8.    PFAS are a group of synthetic chemicals that are used in household products, including bedding and other textiles, for stain and water resistance.

9.    PFAS are entirely manmade and do not occur in nature.

10.    PFAS are known to be toxic to humans, even at very low levels.[3]

11.    Furthermore, PFAS are "forever chemicals," meaning they do not break down naturally in the environment. Use of PFAS in manufacturing textiles and products leads to the accumulation of PFAS in soil, water, humans, and elsewhere in the environment, threatening other organisms.[4]

12.    Consumers have grown increasingly aware of and concerned about PFAS and the presence of PFAS in their bodies, the environment, and the products they use.[5]

13.    As a result, there is a growing consumer-advocacy movement to eliminate PFAS from various products.[6]

14.    On October 18, 2021, underscoring the gravity of the PFAS threat, the Biden-Harris Administration announced accelerated efforts to protect Americans from PFAS on the basis that

---

[3] Abrahm Lustgarten, et al., *Suppressed Study: The EPA Underestimated Dangers of Widespread Chemicals*, ProPublica (June 20, 2018), https://www.propublica.org/article/suppressed-study-the-epa-underestimated-dangers-of-widespread-chemicals; Linda S. Birnbaum, *The Perils of PFAS*, Gillings School of Public Health, UNC (Feb. 12, 2021), https://sph.unc.edu/wp-content/uploads/sites/112/2019/08/The-Perils-of-PFAS-UNC-Final-2.12.21.pdf.

[4] Nat'l Inst. of Env't Health Sciences ("NIEHS"), *Perfluoroalkyl and Polyfluoroalkyl Substances (PFAS)*, Nat'l Inst. of Health U.S. Dept. of Health & Human Servs., https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (last visited Oct. 3, 2025); Francisca Pérez et al., *Accumulation of Perfluoroalkyl Substances in Human Tissues*, 59 Env't Int'l 354 (2013).

[5] LastWeekTonight, *PFAS: Last Week Tonight with John Oliver (HBO)*, YouTube (Oct. 4, 2021), https://www.youtube.com/watch?v=9W74aeuqsiU (demonstrating consumer awareness of the issue).

[6] Elicia Mayuri Cousins, et al., *Risky Business? Manufacturer and Retailer Action to Remove Per- and Polyfluorinated Chemicals from Consumer Products*, NEW SOLUTIONS: A J. of Env't & Occupational Health Pol'y 29(2), 242-65 (2019).

these substances can cause "severe health problems" and persist in the environment once released, "pos[ing] a serious threat across rural, suburban, and urban areas."[7]

15.    In April 2024, the Environmental Protection Agency set a first-ever national limit on PFAS in drinking water for PFOA and PFOS, as the latest science reflects that "there is no level of exposure to these two PFAS without risk of health impacts."[8] In fact, the executive branch has stated that "exposure to PFAS has been linked to deadly cancers, impacts to the liver and heart, and immune and developmental damage to ***infants and children***."[9]

16.    Saatva's representations mislead consumers into believing that the Product is not made with synthetic, environmentally damaging chemicals like PFAS, when in fact, the Product is made with such chemicals.

17.    By deceiving consumers about the nature and quality of its Product, Saatva is able to sell a greater volume of the Product, to charge higher prices for the Product, and to take market share away from competing products, thereby increasing its own sales and profits.

18.    Because Saatva's marketing of the Product tends to mislead and is materially deceptive about the true nature and quality of the Product, Plaintiff Levin brings this case on behalf of himself, and all others similarly situated and seeks equitable and monetary relief.

---

[7] *FACT SHEET: Biden-Harris Administration Launches Plan to Combat PFAS Pollution*, The White House (Oct. 18, 2021), https://web.archive.org/web/20220412162634/https://www.whitehouse.gov/briefing-room/statements-releases/2021/10/18/fact-sheet-biden-harris-administration-launches-plan-to-combat-pfas-pollution/; *see also FACT SHEET: Biden-Harris Administration Combatting PFAS Pollution to Safeguard Clean Drinking Water for All Americans*, The White House (June 15, 2022), https://web.archive.org/web/20230415080503/https://www.whitehouse.gov/briefing-room/statements-releases/2022/06/15/fact-sheet-biden-harris-administration-combatting-pfas-pollution-to-safeguard-clean-drinking-water-for-all-americans/ .

[8] *Final PFAS National Primary Drinking Water Regulation*, EPA, 9 (Apr. 10, 2024), https://www.epa.gov/system/files/documents/2024-04/drinking-water-utilities-and-professionals-technical-overview-of-pfas-npdwr.pdf.

[9] *Biden-Harris Administration Finalizes First-Ever National Drinking Water Standard to Protect 100M People from PFAS Pollution*, EPA (Apr. 10, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-finalizes-first-ever-national-drinking-water-standard (emphasis added).

## FACT ALLEGATIONS

I.    **Defendant Misrepresents the Product As Chemical-Free, Natural, and Eco-Friendly.**

19.    Through express and implied claims and omissions of facts in its advertising of the Product, Saatva misleads consumers to believe that the Product does not contain synthetic chemicals that are harmful to human health and the environment.

20.    On its website, as replicated in the image below, Saatva marketed its crib mattress Product for infants and toddlers with representations such as "nontoxic crib mattress for little ones"[10] and states that the Product contains "eco-friendly materials that are better for you and the planet."[11]



---

5

21.    Saatva's website also states that its "dual-sided baby mattress is designed with the safety and unique sleep needs of babies and toddlers in mind."[12]

22.    Saatva then promises that its crib mattress contains a "[n]ontoxic ***natural*** thistle flame barrier, [and ***no***] fiberglass or toxic ***chemical sprays***."[13] and that the Products are "made with at least 95% organic fiber, ***free of toxic chemicals***, colored with nontoxic dyes, and meet strict social and ***environmental criteria***."[14]

23.    Additionally, as seen in the image below, Saatva advertises its Product as "GREENGUARD Gold Certified,"[15] which according to Saatva means that the Product "meet[s] the highest standards for low chemical emissions, helping to reduce indoor air pollutants and the risk of daily exposure to potentially harmful substances like VOCs."[16]



Healthier sleep

- GREENGUARD® Gold certified, Cradle to Cradle® GOLD Certified & GOTS® certified organic wool

- Nontoxic natural thistle flame barrier, NO fiberglass or toxic chemical sprays

---

[12] *Id.*

[13] *Id.* (emphasis added)

[14] *What is GOTS?*, Saatva, https://saatvahelp.saatva.com/hc/en-us/articles/360043989234-What-is-GOTS (last visited Oct. 10, 2025) (emphasis added).

[15] *Crib Mattress*, *supra* note 10.

[16] *Our Green Initiatives*, *supra* note 11.

- Our **GREENGUARD® Gold\* & eco-INSTITUT®\*\*** certified latex mattresses meet the highest standards for low chemical emissions, helping to reduce indoor pollutants and the risk of daily exposure to potentially harmful substances like VOCs

24.    In addition to promoting the purported Greenguard certification, Saatva also advertises two other third-party certifications of the Product: "Cradle to Cradle GOLD Certified™"[17] and "OEKO-TEX® Standard 100."[18] The representations of the certification seals below are taken from Saatva's website.









25.    Saatva also points to its use of all "eco-friendly" materials in the Product, including "natural latex," as shown in the website screenshot below.[19]

---

[17] *Crib Mattress*, *supra* note 10 (emphasis added).
[18] *Our Green Initiatives*, *supra* note 11 (emphasis added).
[19] *Id.*

Eco-friendly materials

Every Saatva Crib Mattress features:

• Cover made with organic cotton

• Guardin™ botanical antimicrobial treatment

• Cradle to Cradle®* GOLD certified natural latex

• Recycled steel coils

• GOTS®* certified organic New Zealand wool

• Chemical-free flame barrier is OEKO-TEX® Standard 100 certified

• GREENGUARD* Gold certified to help reduce indoor air pollution and your family's risk of daily chemical exposure to potentially harmful substances like volatile organic compounds (VOCs)

*Cradle to Cradle Certified® is a registered trademark of Cradle to Cradle Products Innovation Institute
GOTS® (Global Organic Textile Standard) is a registered trademark of Global Standard gGmbH
GREENGUARD Gold is a trademark of UL LLC

## II. Because It Contains PFAS, the Product Is Not Chemical-Free, Natural, or Eco-Friendly.

26.     Contrary to Saatva's representations, the Product is not chemical-free, natural, and eco-friendly because it contains PFAS, which are synthetic chemicals that pose risks to human health and the environment.

### A. The Product Contains PFAS.

27.     In Spring 2024, Plaintiff Levin purchased a Saatva crib mattress for his son. In Spring 2025, Plaintiff sent his Product out for testing. Below is the full testing information:

- **Product Tested:** Saatva Crib Mattress
- **Test Period:** April 29, 2025 to June 20, 2025
- **Laboratory:** Eurofins Lancaster Laboratories, LLC, 2425 New Holland Pike, Lancaster, PA 17601
- **Methodologies:** SOP T-SSG-WI7750, EPA 537 Isotope Dilution, Microwave Extraction, Preparation, Extract Aliquot
- **Test Results:** PFAS Analyte Results

8

| | |
|---|---|
| Perfluorohexanoic acid (PFHxA) | 8.5 ng/g |
| Perfluorohexanoic acid (PFHxA) | 10 ng/g |
| Perfluorobutanoic acid (PFBA) | 3.0 ng/g |
| Perfluorobutanoic acid (PFBA) | 2.4 ng/g |
| Perfluoropentanoic acid (PFPeA) | 1.4 ng/g |
| Perfluoropentanoic acid (PFPeA) | 1.1 ng/g |

28.     In addition, in or around March 2025, Plaintiff Levin also facilitated testing of his

Saatva crib mattress for TOF testing. Below is the full testing information:

- **Product Tested:** Saatva Crib Mattress
- **Test Period:** March 2025
- **Laboratory:** Galbraith Laboratories, Inc., PO Box 51610, Knoxville, TN 37950
- **Methodologies:** GLI Procedure E9-1, GLI Procedure E9-3
- **Test Results:** 2052 ppm of TOF

29.     Separately, a nonprofit organization, GMO Free USA d/b/a Toxin Free USA

("TFUSA") conducted independent testing of the Product's cover and detected the following

PFAS:[20]

| PFAS Name | Amount (parts per billion ("ppb")) |
|---|---|
| 6:2 FTOH-2-Perfluorohexyl ethanol | 230 |
| Perfluoropentanoic acid (PFPeA) | 0.51 |
| 1H,1H,2H,2H-Perfluorooctane sulfonic acid (6:2 FTS) | 0.19 |
| Perfluorohexanoic acid (PFHxA) | 4 |
| Perfluorobutanoic acid (PFBA) | 1.6 |
| Perfluoroheptanoic acid (PFHpA) | 0.028 |
| Perfluoropropionic acid (PFPrA) | 0.49 |
| 6:2 FTCA | 0.077 |

---

[20] *See GMO Free USA d/b/a Toxin Free USA v. Whitestone Home Furnishing, LLC*, No. 2024-CAB-005259 (D.C. Super. Ct. filed Aug. 16, 2024).

30.    PFBA is listed as a proposed hazardous constituent under the Environmental Protection Agency's ("EPA") Resource Conservation and Recovery Act, meaning that this chemical has been shown in scientific studies to have toxic, carcinogenic, mutagenic, or teratogenic effects on humans or other life forms.[21]

31.    PFHxA has been found likely to cause hepatic, developmental, hematopoietic, and endocrine effects in humans.[22]

32.    6:2 FTOH-2-Perfluorohexyl ethanol is a short-chain PFAS chemical that is significantly more toxic than PFHxA.[23]

33.    PFPeA is linked to cancer, harms the immune system, causes hormone disruption, and disrupts fetal growth, child development, and the liver.[24]

34.    PFHpA and 6:2 FTCA have also been shown to cause health and environmental harms.[25]

35.    Additional testing by TFUSA also confirmed that the Product contains 949 parts per million of Total Organic Fluorine, which for certain states, is a sign of "intentionally added" PFAS in a Product.[26]

---

[21] *Listing of Specific PFAS as Hazardous Constituents,* 89 Fed. Reg. 8606, 8606-21 (Feb. 8, 2024).

[22] U.S. Environmental Protection Agency, *IRIS Toxicological Review of Perfluorohexanoic Acid [PFHxA, CASRN 307-24-4] and Related Salts* (Apr. 2023), https://cfpub.epa.gov/ncea/iris/iris_documents/documents/subst/0704_summary.pdf.

[23] Penelope A. Rice, et al., *Comparative Analysis of the Toxicological Databases for 6:2 Fluorotelomer Alcohol (6:2 FTOH) and Perfluorohexanoic Acid (PFHxA)*, 138 Food and Chemical Toxicology 111210 (Apr. 2020), https://www.sciencedirect.com/science/article/abs/pii/S0278691520300983.

[24] *Perfluoropentanoic Acid (PFPeA)*, Env'tal Working Group, https://www.ewg.org/tapwater/contaminant.php?contamcode=E208 (last visited Oct. 10, 2025).

[25] *See Perfluoroheptanoic acid (PFHpA)*, Vt. Dept. of Health (Mar. 2023), https://www.healthvermont.gov/sites/default/files/document/env-cdp-375-85-9-pfhpa.pdf; Guohui Shi, et al., *6:2 Fluorotelomer Carboxylic Acid (6:2 FTCA) Exposure Induces Developmental Toxicity and Inhibits the Formation of Erythrocytes During Zebrafish Embryogenesis*, 190 Aquatic Toxicology 53-61 (Sept. 2017), https://doi.org/10.1016/j.aquatox.2017.06.023.

[26] Cal. Health & Safety Code § 109000 (a)(3)(B) ("The presence of PFAS in a product or product component [is detected] at or above 100 parts per million, as measured in total organic fluorine.").

## B. PFAS Are Synthetic Unsustainable Chemicals.

36.     PFAS are known as "forever chemicals" because their carbon-fluorine bonds are extremely strong and are not appreciably degraded under environmental conditions. The continued use of PFAS is, by the nature of these chemicals, unsustainable and environmentally unfriendly, because it will necessarily lead to a greater concentration of PFAS in the environment.[27]

37.     The PFAS family of chemicals was accidentally discovered in 1938 by a scientist working at E.I. du Pont de Nemours and Company ("DuPont"). In the decades following that discovery, DuPont and The 3M Company ("3M") became the primary manufacturers of PFAS.

38.     For decades, DuPont, 3M, and other manufacturers were aware that PFAS persist indefinitely in the environment, bioaccumulate in blood, and pose a substantial threat to human health and the environment. Exposés have revealed what these companies knew regarding the dangers associated with these substances.[28]

39.     Despite the previous attempts to keep this information from the public, DuPont and other manufacturers have themselves now openly stated in litigation documents that the PFAS family of chemicals as a whole, not just specific types, are "hazardous substances."[29]

40.     The oldest kinds of PFAS developed and used in consumer products are referred to as "long-chain" PFAS.

---

[27] Zhanyun Wang, et al., *A Never-Ending Story of Per- and Polyfluoroalkyl Substances (PFASs)?*, 51 Env't Sci. Technol. 2508, 2508 (Feb. 22, 2017), https://doi.org/10.1021/acs.est.6b04806.

[28] *See, e.g.*, Sharon Lerner, *How 3M Executives Convinced a Scientist the Forever Chemicals She Found in Human Blood Were Safe*, Pro Publica (May 20, 2024), https://www.propublica.org/article/3m-forever-chemicals-pfas-pfos-inside-story.

[29] *N.J. Dept. of Env't. Protection v. E. I. duPont de Nemours and Co.*, 2:19-cv-14758, ECF No. 118 at 12 (D.N.J. March 30, 2021).

41.    Long-chain PFAS have been "banned in the European Union and phased out by major U.S. manufacturers," largely due to their health risks.[30]

42.    As a result of widespread concern regarding the environmental and health impacts of long-chain PFAS and greater regulation of these substances, many manufacturers have switched to using "short-chain" PFAS, also known as "GenX chemicals."

43.    The 6:2 FTOH found in the Product, *see supra* ¶ 27, for instance, is a short-chain PFAS.[31]

44.    Although short-chain PFAS were once thought to be a safer alternative to long-chain PFAS, research indicates that the human health risks of short-chain PFAS have been gravely underestimated.[32] As an example of how unsafe these newer PFAS are, EPA regulations concerning GenX Chemicals in drinking water are set at a Maximum Contaminant Level of 10 parts per ***trillion***.[33]

45.    There are a multitude of reasons why PFAS, including the specific chemicals identified in *supra* ¶ 27, are unnatural and unsustainable.

46.    For example, materials containing PFAS degrade over time, releasing the chemicals into the air, household dust, and laundry water, all of which enter the environment and potentially, drinking water. PFAS also enter the environment when products containing them are disposed of in landfills.[34]

---

[30] Erika Schreder, et al., *Toxic Convenience: The hidden costs of forever chemicals in stain- and water-resistant products*, Toxic-Free Future (Jan. 2022), https://toxicfreefuture.org/wp-content/uploads/2022/08/toxic-convenience.pdf.

[31] Penelope Rice et al., *supra* note 23.

[32] *See, e.g.*, David Andrews, *FDA Studies: 'Short-chain' PFAS Chemicals More Toxic Than Previously Thought*, Env'tal Working Grp. (Mar. 9, 2020), https://www.ewg.org/news-insights/news/fda-studies-short-chain-pfas-chemicals-more-toxic-previously-thought.

[33] *Final PFAS National Primary Drinking Water Regulation*, *supra* note 8.

[34] Schreder, et al., *supra* note 30, at 5-6.

47.      Humans are also exposed to PFAS when they ingest household dust. The risk of such exposure is greater for infants and young children, who spend more time on the floor and tend to put things in their mouths.[35]

48.      Exposures may also occur through inhalation of PFAS in the air and through skin absorption from direct contact with PFAS materials, such as bedding.[36]

49.      Children are more vulnerable to the harmful effects of PFAS than adults.[37]

50.      On the regulatory front, the EPA currently advises the public about the health threats presented by PFAS as a whole family:

> Peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:
>
> - Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.
>
> - Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.
>
> - Increased risk of some cancers, including prostate, kidney, and testicular cancers.
>
> - Reduced ability of the body's immune system to fight infections, including reduced vaccine response.
>
> - Interference with the body's natural hormones.
>
> - Increased cholesterol levels and/or risk of obesity.[38]

---

[35] *See* Rice, *supra* note 23, at 2.

[36] Schreder, et al., *supra* note 30, at 5; *see also* Oddný Ragnarsdótti, et al., *Dermal Bioavailability of Perfluoroalkyl Substances Using in Vitro 3D Human Skin Equivalent Models*, 188 Env't Int'l 108772 (June 2024) ("Based on the data presented in this study, dermal exposure could be a significant source of exposure for some PFAS, especially the shorter-chain PFAS. Thus, the dermal route should not be dismissed as a possible route of human exposure to PFAS.").

[37] Alan D. Woolf, et al., *Report outlines health effects of PFAS chemicals in children, provides recommendations for testing*, AAP News (Sept. 13, 2022), https://bit.ly/3h38Hem.

[38] *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, EPA, https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last visited Oct. 10, 2025).

51.    The EPA advises that "[b]ecause children are still developing, they may be more sensitive to the harmful effects of chemicals such as PFAS."[39]

52.    Also, because "PFAS can often be found together in mixtures, and research shows these mixtures may have combined health impacts," the EPA has also set "a limit for any mixture of two or more of the following PFAS: PFNA, PFHxS, PFBS, and 'GenX Chemicals.'"[40]

53.    These health repercussions and "forever chemical" status make PFAS unsustainable.

54.    Because the Product contains PFAS and, therefore, contains chemicals, Saatva's "chemical-free" representation is false.

55.    Because PFAS are man-made unsustainable chemicals, Saatva's representations that the Product is chemical-free, natural, and eco-friendly mislead consumers to believe that the Product does not contain a substance such as PFAS.

### III.    Defendant's Representations About the Product Mislead Reasonable Consumers.

56.    Saatva's representations that its Product is chemical-free, natural, and eco-friendly are false and therefore inherently misleading to consumers, who care about purchasing chemical-free, natural, and eco-friendly products for their families and communities. A false statement provides incorrect information, which leads these consumers to buy the Product based on the incorrect information.

57.    Reasonable consumers encountering Saatva's representations emphasizing that the Product is chemical-free, natural, and eco-friendly would not expect the Product to contain unsustainable synthetic chemicals.

---

[39] *Id.*

[40] *Biden-Harris Administration Finalizes First-Ever National Drinking Water Standard to Protect 100M People from PFAS Pollution, supra* note 9.

14

58.     Consumers, for example, believe "natural" means that a product is "healthy, safe, and better for the environment."[41] PFAS, however, are synthetic and unnatural chemicals that cause health and environmental harms. Therefore, Saatva's representations that the Product is chemical-free, natural, and eco-friendly are misleading.

59.     Consumers cannot discover the true nature of the Products from reading Saatva's websites or marketing materials. Ordinary consumers do not have the ability to test mattresses for PFAS.

60.     Reasonable consumers, therefore, must, and do, rely on the Product labeling and websites to share important information about the Product.

61.     Nothing about the Product's labeling or advertising would alert a reasonable consumer to the PFAS within the Product.

62.     In failing to disclose that the Product contains PFAS, and making false and misleading representations about the Product, Saatva deceptively encourages consumers to purchase the Product.

63.     Saatva knows what representations it makes in marketing the Product. Saatva also knows how the Product is sourced and produced. Saatva thus knows, knew, or should have known, the facts demonstrating that the Product is falsely represented to consumers.

64.     Saatva is aware of the consumer market trend towards chemical-free, natural, and eco-friendly Products. In making the false, misleading, and deceptive representations, Saatva knew and intended that consumers would choose to buy, and would pay more for, products represented to be chemical-free, natural, and eco-friendly, furthering Saatva's private interest of

---

[41] Lu Ann Williams, *Consumers Associate Natural, Organic with Clean Label*, Prepared Foods (June 14, 2022), https://www.preparedfoods.com/articles/127006-consumers-associate-natural-organic-with-clean-label.

increasing sales of the Product and decreasing the sales of its competitors' mattress products that are truthfully marketed.

65.    Saatva charges a price premium as a result of its chemical-free, natural, and eco-friendly representations:[42]



[42] *Compare Crib Mattress*, *supra* note 2 *with Sweet Bliss Dual Sided Crib and Toddler Mattress*, Delta Children, https://www.deltachildren.com/collections/mattresses-collection/products/sweet-bliss-dual-sided-crib-and-toddler-mattress (last visited Oct. 10, 2025); *Essential Crib Mattress*, Newton, https://www.newtonbaby.com/products/essential-crib-mattress (last visited Oct. 10, 2025); *Sealy Cozy Rest 2-Stage Crib Mattress*, Sealy, https://sealybaby.com/product/sealy-cozy-rest-extra-firm/ (last visited Oct. 10, 2025).







66.     Consumers are at risk of real, immediate, and ongoing harm if the Product continues to be sold with the misleading representations.

67.     Had Saatva marketed its Product truthfully, consumers would not have purchased Product or would not have been willing to pay as much as they paid for the Product.

68.     Saatva has profited from its deception of consumers by causing them to purchase the Product when they would not have been willing to buy it, or to pay more for the Product than they would have been willing to pay, had they known that the Product contains PFAS.

**IV.     Saatva's Representations Are Material to Consumers.**

69.     Saatva's representations are material in that a reasonable person would attach importance to such information—the presence of PFAS in the Product, which are unnatural and environmentally unsustainable chemicals—and would be induced to act upon such information in making purchasing decisions.

70.     Consumers care about whether the products they purchase contain unnatural environmentally unfriendly chemicals.

71.     The consumer desire to avoid PFAS in their products is best illustrated by multiple state regulations which prohibit PFAS in textile-based consumer products.[43]

72.     One study found that "93% of voters agree and 62% strongly agree that companies should do a better job of removing harmful chemicals from consumer products."[44]

---

[43] California was the first state to regulate PFAS in textiles. *See* 2021 Bill Text CA A.B. 1817. New York has since enacted similar legislation. *See* 2023 Bill Text NY S.B. 1322.

[44]     *Public Opinion on Chemicals*, UCSF Program on Reproductive Health and the Environment, https://prhe.ucsf.edu/public-opinion-chemicals (last visited Oct. 10, 2025).

73.     Another survey found that 81 percent of people polled expect companies to be environmentally conscious in their advertising and communications, and 69 percent of respondents said they were doing everything possible to minimize their carbon footprint.[45]

74.     Also, "68% [of Americans] would pay more for sustainable products."[46]

75.     Even more specifically, "[t]wo-thirds of consumers say they would pay more for a *mattress* manufactured using environmentally sustainable practices or materials."[47]

76.     Further, "70% [of consumers] expect natural products companies to be transparent about sourcing and ingredients."[48]

77.     In addition, a survey by the nonprofit group Toxic-Free Future revealed that 84% of consumers are much more likely to shop from retailers that have taken steps to eliminate toxins from products they sell, and that 93% of the 1,600 consumers surveyed are more likely to buy a product if it has an independent third-party seal of approval.[49]

78.     Regarding environmental claims, the Federal Trade Commission ("FTC") has released "Green Guides" that "caution marketers not to make unqualified general environmental benefit claims because 'it is highly unlikely that marketers can substantiate all reasonable interpretations of these claims.'"[50]

---

[45]     *New Getty Images research shows that climate and sustainability still top concern despite the COVID-19 pandemic*, PR Newswire (Oct. 7, 2020), https://www.prnewswire.com/news-releases/new-getty-images-research-shows-that-climate-and-sustainability-still-top-concern-despite-the-covid-19-pandemic-301147426.html.

[46]     *Interest in Sustainability Surges for Consumer Products*, Computer Generated Solutions Inc., https://www.cgsinc.com/en/resources/interest-sustainability-surges-consumer-products (last visited Oct. 10, 2025).

[47]     David Perry, *Survey: Many Consumers Would Pay More for Sustainable Mattress*, BedTimes (Nov. 15, 2022), https://bedtimesmagazine.com/2022/11/survey-many-consumers-would-pay-more-for-sustainable-mattress/ (emphasis added).

[48]     Victoria A.F. Camron, *Survey: Consumers expect more from natural products brands*, New Hope Network (Oct. 20, 2021), https://www.newhope.com/market-data-and-analysis/survey-consumers-expect-more-natural-products-brands.

[49]     *Survey Results: Shoppers voting for safe and healthy products with their wallets*, Toxic-Free Future (July 10, 2017), https://toxicfreefuture.org/blog/survey-results-shoppers-voting-for-safe-and-healthy-products-with-their-wallets/.

[50]     16 C.F.R. § 260.4(b) (2012).

79.     Finally, purchasing the right crib mattress is important, given that infants sleep from 14 to 19 hours per day.[51]

## PARTIES

80.     Defendant Whitestone Home Furnishings, LLC d/b/a Saatva is incorporated in Delaware and headquartered in New York.

81.     Defendant markets and sells the Product in stores and online nationwide, including New York.

82.     Plaintiff Levin is an individual consumer who is currently a citizen of Chicago, IL, but had purchased a Saatva crib mattress Product when he lived in New York.

83.     Plaintiff Levin conducted extensive research when looking for a crib mattress to ensure that the mattress he purchased would be safe and free from chemicals like PFAS, phatlates, flame retardants, etc.

84.     On April 4, 2024, during Plaintiff Levin's search for a crib mattress for his son, he reached out to Defendant's via the Saatva website customer support chat function to inquire about whether the Products contain PFAS. Defendant's customer support agent represented that there are no PFAS in the Products.

---

[51]     Elena    Ben-Joseph,    *Sleep    and    Your    Newborn*,    Nemours    KidsHealth, https://kidshealth.org/en/parents/sleepnewborn.html (last visited Oct. 10, 2025) (indicating range of hours of sleep for newborns).



85.    On April 8, 2024, Plaintiff Levin, who was living in New York at the time, purchased Saatva's crib mattress Product marketed with the representations at issue directly from Saatva's website.

86.    Before he placed the order, he received a marketing email from Saatva, which emphasized that the crib mattress Product is "free of invasive chemicals in the production process" and discussed Saatva's commitment to safety. This email further assured Plaintiff Levin that the Product he purchased would be free from chemicals such as PFAS.

OH, BABY

# This Is Important

It's silly to imagine anything less than the best for your baby. And that includes sleeping as safely and soundly as possible from the start. That also means having a crib mattress you know is free of invasive chemicals in the production process.

The Saatva crib you chose is **GREENGUARD Gold Certified** to be free of harmful emissions, formaldehyde, and volatile organic compounds. It is made from **naturally hypoallergenic and antimicrobial organic cotton and organic wool,** with a fiberglass-free flame barrier cover for a safer sleep.

Take a look at the articles we've attached, which may help your decision. No matter what, it never hurts to know more.

87. Plaintiff Levin, before he purchased the Products, saw and believed that the Products were natural, environmentally friendly, and did not contain toxic chemicals, based on the Product's marketing representations. The representations of the Product were material to Plaintiff Levin and encouraged him to make his purchase. Plaintiff Levin relied upon these representations, which as a consumer he had no reason to doubt, especially after confirming with Defendant that the Product he wanted to purchase was PFAS free. *See supra* ¶ 84.

88. On January 6, 2025, Plaintiff Levin stumbled upon TFUSA's testing, which found PFAS in the Product. *See supra* ¶ 29. Plaintiff Levin then proceeded to test the Saatva crib

mattress he purchased for PFAS. *See supra* ¶ 27.

89.     Plaintiff Levin would not have purchased the Product if he had known that contrary to Saatva's representations, the Product contained PFAS.

90.     As a direct result of Saatva's material misrepresentations, Plaintiff suffered, and continues to suffer, economic injuries.

91.     Also, as a direct result of Saatva's material misrepresentations, Plaintiff and the putative class are being continuously harmed as they cannot know if any future purchases of Saatva mattresses will contain PFAS as long as they Product is being advertised as chemical-free, natural, and eco-friendly.

92.     On or around January 23, 2025, Plaintiff sent Saatva a notice letter about the allegations set forth in this Complaint.

93.     Accordingly, Plaintiff Levin, on behalf of himself and all other members of the proposed Class, seeks relief, including punitive damages, from Saatva's acts and practices.

## JURISDICTION AND VENUE

94.     This Court has personal jurisdiction over the parties in this case.

95.     Defendant Saatva is incorporated in New York, regularly conducts and transacts business in New York, purposefully avails itself of the laws of New York, markets the Product to consumers in New York, and sells the Product throughout New York.

96.     Plaintiff Levin's claims arise out of, and relate to, the conduct of Saatva within New York.

97.     Saatva products are sold throughout the state of New York at various retailers and online.

98.     Based on the foregoing, both general and specific jurisdiction exist over Defendant.

99.     Plaintiff Levin is a citizen of Illinois, who purchased the Product in New York, and

consents to this Court's jurisdiction.

100.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), which provides for the original jurisdiction of the federal courts in any class action in which the proposed plaintiff class is comprised of at least 100 members, any member of the plaintiff class is a citizen of a State different from any defendant, and the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs. Plaintiff Levin alleges that the total claims of individual members of the proposed Class (as defined herein) exceed $5,000,000 in the aggregate, exclusive of interest and costs.

101.    Venue is proper in this District under 28 U.S.C. § 1391(a). Substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature and quality of the Product, occurred within this District.

## CLASS ALLEGATIONS

102.    Plaintiff Levin brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated individuals nationwide (the "Class"), defined as follows:

> All consumers who purchased the Product within the United States during the applicable statute of limitations period (the "Class Period") and until the date of class certification.

103.    Included in the Class, to the extent necessary, is a subclass of all persons who purchased the Product (as defined herein) in New York during the Class Period (the "New York Subclass").

104.    Excluded from the Class are (1) Defendant, (2) any entity or division in which either Defendant has a controlling interest, (3) Defendant's legal representatives, officers, directors, assigns, and successors; and (4) the judge to whom this case is assigned and the judge's staff.

105. Questions of law and fact common to all Class members predominate over questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    (a)    Whether Defendant is responsible for the advertising at issue;

    (b)    Whether the advertising of the Product was unfair, false, deceptive, fraudulent and/or unlawful;

    (c)    Whether Defendant breached a warranty created through the marketing of the Products;

    (d)    Whether Defendant was unjustly enriched; and

    (e)    Whether Defendant's conduct as set forth above injured Plaintiff Levin and Class members.

106. Plaintiff Levin's claims are typical of the claims of the Class in that he was exposed to Defendant Saatva's false and misleading marketing, promotional materials, and representations, purchased the Product, and suffered a loss as a result of that purchase.

107. The precise number of the Class members and their identities are unknown to Plaintiff Levin at this time but may be determined through discovery.

108. Plaintiff Levin is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions involving false advertising, and he intends to prosecute this action vigorously.

109. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the litigation necessary to establish Defendant's liability. A class action provides a fair and efficient method, if not the only method, for adjudicating this controversy and avoids the potential for inconsistent or

contradictory judgments. The substantive claims of Plaintiff Levin and the Class are identical or nearly identical and will require evidentiary proof of the same kind and application of the same laws. There is no plain, speedy, or adequate remedy other than by maintenance of this class action.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because Class members number in the thousands and individual joinder is impracticable. The expense and burden of individual litigation would make it impracticable or impossible for proposed Class members to prosecute their claims individually, and the disposition of this case as part of a single class action lawsuit will benefit the parties and greatly reduce the aggregate judicial resources that would be spent if this matter were handled as hundreds or thousands of separate lawsuits. Trial of Plaintiff Levin's and the Class members' claims together is manageable. Unless the Class is certified, Defendant will remain free to continue to engage in the wrongful conduct alleged herein without consequence.

111.    No member of the Class has a substantial interest in individually controlling the prosecution of a separate action.

112.    The prerequisites to maintaining a class action for equitable relief are met. By misrepresenting the characteristics of its Product and failing to disclose that its Product contains PFAS, Defendant has acted or refused to act on grounds generally applicable to the Class, thereby, making appropriate final equitable and monetary relief with respect to the Class as a whole.

113.    The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendant. Additionally, individual actions could be dispositive of the interests of the Class, in practice, even where certain Class members are not parties to such actions.

114.    Defendant Saatva's conduct is generally applicable to the Class as a whole, and Plaintiff Levin seeks, *inter alia*, equitable remedies with respect to the Class as a whole.

115.    Plaintiff Levin knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance of a class action.

### CAUSES OF ACTION

### COUNT I
### Violations of the New York General Business Law § 349
### (On Behalf of Plaintiff Levin and the New York Subclass)

116.    Plaintiff Levin realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

117.    The acts of Defendant, as described above, constitute unlawful, deceptive, and fraudulent business acts and practices.

118.    Defendant Saatva marketed the Product as chemical-free, natural, and eco-friendly, when testing revealed that the Product contained PFAS, which are environmentally harmful synthetic chemicals.

119.    Defendant made the misleading statements, representations, and advertisements willfully, wantonly, and with reckless disregard for the truth.

120.    Defendant has violated section 349 of the New York General Business Law ("NYGBL"), which makes deceptive acts and practices unlawful. As a direct and proximate result of Defendant's violation of section 349, Plaintiff Levin and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

121.    By reason of the foregoing, Plaintiff Levin and the New York Subclass members are entitled to (1) actual damages and/or statutory damages; (2) punitive damages; and (3) reasonable attorneys' fees, pursuant to NYGBL § 349(h).

## COUNT II
### Violations of the New York General Business Law § 350
### (On Behalf of Plaintiff Levin and the New York Subclass)

122. Plaintiff Levin realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

123. The acts of Defendant Saatva, as described above and herein, constitute unlawful, deceptive, and fraudulent business acts and practices as described *supra*.

124. NYGBL section 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

125. Defendant made the false statements willfully, wantonly, and with reckless disregard for the truth.

126. Plaintiff Levin and the New York Subclass members have been injured by their purchase of the Product. As a direct and proximate result of Defendant's violation of section 350, Plaintiff Levin and other members of the New York Subclass have suffered damages in an amount to be determined at trial.

127. Accordingly, Plaintiff Levin, on behalf of himself and all other members of the New York Subclass, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices.

## COUNT III
### Violation of State Consumer Protection Statutes
### (on Behalf of Plaintiff Levin and All Class Members)

128. Plaintiff Levin realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

129. Defendant's unfair, false, misleading, and fraudulent practices in marketing the Products, as alleged herein, violate each of the following state consumer protection statutes to the

extent that Defendant's Products have been marketed in, and purchased by Class members in, the respective states: Ala. Code § 8-19-5(27); Alaska Stat. § 45.50.471(a); Ariz. Rev. Stat. § 44-1522; Ark. Code § 4-88-107(a), (a)(10); Cal. Civ. Code § 1750, Cal. Bus. & Prof. Code §§ 17200, 17500, 17580.5; Colo. Rev. Stat. §§ 6-1-105 (e), (g); Conn. Gen. Stat.§ 42-110b(a); Del. Code Ann. tit. 6, § 2513(a); Fla. Stat. Ann. § 501.204; Ga. Code § 10-1-393(a); Haw. Rev. Stat. § 480-2(a), (d); Idaho Code § 48-603(17); 815 Ill. Comp. Stat. Ann. § 505/2; Ind. Code § 24-5-0.5-3(a); Iowa Code § 714H.3(1); Kan. Stat. § 50-626(a); Ky. Rev. Stat. § 367.170; La. Rev. Stat. Ann. § 51:1405(A); Me. Rev. Stat. Ann. tit. 5 § 207; Md. Code Comm. Law § 13-301(1), (3); § 13-303; Mass. Gen. Laws Ch. 93A, § 2(a); Mich. Comp. Laws Ann. § 445.903(1)(s), (bb), (cc); Minn. Stat. § 325F.69(1); Miss. Code § 75-24-5(2)(e),(g); Mo. Rev. Stat. § 407.020(1); Mont. Code § 30-14-103; Neb. Rev. Stat. § 59-1602; Nev. Rev. Stat. § 598.0915(15); N.H. Rev. Stat. § 358-A:2; N.J. Stat. Ann. § 56:8-2; N.M. Stat. Ann. §§ 57-12-2(D), 57-12-3; N.Y. Gen. Bus. Law §§ 349, 350; N.C. Gen. Stat. § 75-1.1(a); N.D. Century Code §§ 51-15-02, 51-15-02.3; Ohio Rev. Code § 1345.02; Okla. Stat. Ann. tit. 15, §§ 753, 752(13); Or. Rev. Stat. § 646.608(1); 73 Pa. Stat. § 201-2(4); R.I. Gen. Laws §§ 6-13.1-1(6)(xii), (xiii), (xiv), 6-13.1-2; S.C. Code § 39-5-20(a); S.D. Codified Laws § 37-24-6(1); Tenn. Code § 47-18-104(a); Tex. Bus. & Com. Code § 17.46(b)(2),(3),(5),(7),(24); Utah Code Ann. § 13-11-4(1); Vt. Stat. Ann. tit. 9, § 2453(a); Va. Code Ann. § 59.1-200(A)(14); Wash. Rev. Code § 19.86.020; W. Va. Code §§ 46A-6-102(7); Wis. Stat. Ann. § 100.18(1); Wyo. Stat. Ann. § 40-12-105(a)(xv).

130. Defendant made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

131. Plaintiff Levin and all other Class members have been injured by their purchase of the Products.

132.   As a direct and proximate result of Defendant's violation of consumer protection law, Plaintiff Levin and all other Class members have suffered damages in an amount to be determined at trial.

133.   On January 23, 2025, Plaintiff Levin sent a pre-suit letter to Defendant via electronic mail that provided notice of Defendant's violations of state consumer protection statutes and demanded that Defendant corrects, repairs, replaces, or otherwise rectifies the unlawful, unfair, false, and/or deceptive practices complained of herein. The letters also stated that if Defendant refused to do so, a complaint seeking damages would be filed. Counsel for Defendant and Plaintiff met and conferred on the pre-suit letter. Accordingly, Plaintiff, on behalf of himself and all other members of the Class, seeks compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Defendant's acts and practices, according to the availability of relief under the applicable statutes.

<u>**COUNT IV**</u>
**Breach of Express Warranty**
**Under the Common Law of Each State**
**(on Behalf of Plaintiff Levin and All Class Members)**

134.   Plaintiff Levin realleges and reincorporates by reference all paragraphs alleged above.

135.   Plaintiff Levin brings this claim individually and on behalf of the Class.

136.   Defendant Saatva provided Plaintiff Levin and other members of the Class with written, express warranties that the Product is chemical-free, natural, and eco-friendly, via Defendant's website, which is easily accessible to any consumer and through which consumers may purchase the Product.

137.   This affirmation of fact or promise by Defendant relates to the goods and became part of the basis of the bargain.

138.   Plaintiff Levin and members of the Class purchased the Products believing them to conform to the express warranties.

139.   Defendant breached these warranties, resulting in damages to Plaintiff Levin and other members of the Class, who bought Defendant's Products but did not receive the goods as warranted.

140.   As a proximate result of the breach of warranties by Saatva, Plaintiff Levin and the other members of the Class did not receive the goods as warranted. Moreover, had Plaintiff Levin and the Class members known the true facts, they would not have purchased Defendant's Products, or would have purchased the Products on different terms, or would have purchased fewer of the Products.

141.   Notice of these breaches of warranty was provided to Defendant as described in *supra* ¶ 92 which is incorporated here by reference as if fully set forth herein.

142.   Plaintiff Levin and the members of the Class therefore have been injured and have suffered damages in an amount to be proven at trial.

<u>**COUNT V**</u>
**Breach of Implied Warranty**
**(on Behalf of Plaintiff Levin and All Class Members)**

143.   Plaintiff Levin realleges and incorporates herein by reference all preceding paragraphs of this Complaint as though set forth and at length herein.

144.   Plaintiff brings this claim individually and on behalf of the Members of the proposed Class and Subclasses against Defendant.

145.   Plaintiff Levin and the New York Subclass will proceed under New York law, while the other Subclasses will proceed, in the alternative, according to the state law where the purchases were made.

146. Defendant routinely engages in the manufacture, distribution, and/or sale of the Products and are merchants that deal in such goods or otherwise holds itself out as having knowledge or skill particular to the practices and goods involved.

147. Plaintiff Levin and Members of the Class and Subclasses were consumers who purchased Defendant's Products for the ordinary purpose of such products. In the alternative, Defendant marketed the Products, and Plaintiff Levin and Members of the Class and Subclasses purchased the Products, for the specific purpose of receiving mattresses that were chemical-free, natural, and eco-friendly, but received far less.

148. By representing that the Products would conform to the chemical-free, natural, and eco-friendly representations, Defendant impliedly warranted to consumers that the Products were merchantable, such that they were of the same average grade, quality, and value as similar goods sold under similar circumstances.

149. The Products, however, were not of the same average grade, quality, and value as similar goods sold under similar circumstances due to the presence of PFAS in the Products. Thus, they were not merchantable and, as such, would not pass without objection in the trade or industry under the Product description.

150. As a direct and proximate result of Defendant's breach, Plaintiff Levin and Members of the Class and Subclasses were injured because they paid money for the Products that would not pass without objection in the trade or industry under the contract description.

### COUNT VI
**Unjust Enrichment**
**(on Behalf of Plaintiff Levin and All Class Members)**
*In the alternative*

151. Plaintiff Levin realleges and reincorporates by reference all paragraphs alleged above.

152.    Plaintiff Levin brings this claim individually and on behalf of the Class in the alternative to the other causes of action.

153.    To the extent required by law, this cause of action is alleged in the alternative to legal claims, as permitted under Fed. R. Civ. P. 8.

154.    Plaintiff Levin and the members of the Class conferred benefits on Defendant by purchasing the Products or paying more for them than they otherwise would have been willing to pay.

155.    Defendant Saatva was unjustly enriched by receipt of these revenues derived from the purchases of Plaintiff Levin and the members of the Class.

156.    Retention of those monies under these circumstances is unjust and inequitable because Defendant misrepresented its Product and deceived consumers.

157.    Plaintiff Levin and members of the Class were damaged by Defendant's misrepresentations because they would not have purchased the Products, or would not have paid as much as they did, if the true facts were known.

158.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiff Levin and the members of the Class is unjust and violates the fundamental principles of justice, equity, and good conscience, Defendant has been unjustly enriched in an amount to be determined at trial.

159.    Plaintiff Levin and the members of the Class have no adequate remedy at law.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Levin respectfully requests that the Court enter judgment in his favor and in favor of the Class as follows:

A.    An order certifying the proposed Class and Subclass; appointing Plaintiff Levin as

representative of the Class and Subclass; and appointing Plaintiff Levin's undersigned counsel as class counsel for the Class and Subclass;

B.     An order declaring that Defendant Saatva is financially responsible for notifying Class members of the pendency of this suit;

C.     An order declaring that Defendant's conduct violates the statutes referenced herein;

D.     An order awarding monetary damages, including actual damages, statutory damages, and punitive damages, in the maximum amount provided by law under the statutes named herein;

E.     An order awarding compensation for breach of warranty;

F.     An order for prejudgment interest on all amounts awarded;

G.     An order awarding Plaintiff Levin and the other Class members the reasonable costs and expenses of suit, including their attorneys' fees; and

H.     An order of restitution and all other forms of equitable monetary relief;

I.     Injunctive relief as pleaded or as the Court may deem proper; and

J.     Any further relief that the Court may deem appropriate.

## <u>JURY TRIAL DEMANDED</u>

160.     Plaintiff Levin hereby demands a trial by jury.

DATED: October 16, 2025                    Respectfully submitted,


_____
Kim E. Richman
**RICHMAN LAW & POLICY**
1 Bridge Street, Suite 83
Irvington, NY 10533
T: (914) 693-2018
krichman@richmanlawpolicy.com

*Attorney for Plaintiff and Proposed Class*